**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION**

| | | |
|---|---|---|
| CARL M. REID, III, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CASE NO.: 1:20-CV-259 (LAG) |
| | : | |
| MIDDLE FLINT AREA COMMUNITY | : | |
| SERVICE BOARD, d/b/a MIDDLE | : | |
| FLINT BEHAVIORAL HEALTHCARE, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## <u>ORDER</u>

Before the Court is Defendant's Motion for Summary Judgment. (Doc. 21). For the reasons stated below, Defendant's Motion is **DENIED in part and GRANTED in part**.

## PROCEDURAL BACKGROUND

Plaintiff Carl M. Reid, III, initiated this employment discrimination action against Defendant Middle Flint Area Community Service Board, doing business as Middle Flint Behavioral Healthcare, on December 21, 2020. (Doc. 1). With the Court's leave, Plaintiff filed an Amended Complaint on March 31, 2021.[1] (Doc. 9). In the Amended Complaint, Plaintiff alleges that Defendant discriminated against him because of his disability when it transferred him to a new location, failed to provide him with a reasonable accommodation, and discharged him. (Doc. 9 ¶¶ 91, 101–04, 112–13). Plaintiff also alleges that Defendant discharged him in retaliation for complaining about the alleged disability discrimination. (*Id.* ¶¶ 114–15). He brings claims under the American with Disabilities Act (ADA), Section 504 of the Rehabilitation Act of 1973, and Title VII of the Civil Rights Act of 1964. (*Id.* ¶¶ 86–116). After discovery, Defendant filed a Motion for Summary Judgment on

---

[1]     Plaintiff's Amended Complaint added Healthcare Staffing, Inc., as a defendant. (*See* Doc. 9 at 1). Plaintiff and Healthcare Staffing, Inc., subsequently filed a Joint Stipulation of Dismissal on January 19, 2022, voluntarily dismissing all claims against Healthcare Staffing, Inc., with prejudice. (Doc. 23 at 1). Thus, Middle Flint is the only remaining defendant in this case.

December 20, 2021. (Doc. 21). Plaintiff responded on January 24, 2022, and Defendant replied on February 7, 2022. (Docs. 26, 27). Accordingly, Defendant's Motion is ripe for review. M.D. Ga. L.R. 7.3.1(A).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate where "the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (citation omitted). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citations omitted). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1311 (11th Cir. 2018) (quoting *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004)). At summary judgment, the Court views the evidence "in the light most favorable to the non-moving party" and resolves factual disputes for the nonmoving party when doing so is supported by sufficient evidence. *Gogel*, 967 F.3d at 1134 (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007) (per curiam)); *Whitehead v. BBVA Compass Bank*, 979 F.3d 1327, 1328 (11th Cir. 2020).

The parting moving for summary judgment "bears the initial burden" of showing, by reference to the record, "the absence of a genuine issue of material fact." *Whitehead*, 979 F.3d at 1328 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018). The movant can meet this burden by "identify[ing] the portions of the record" that show there is no "genuine issue of material fact" or "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case" for which it bears the ultimate burden of proof. *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (citing

2

*Celotex*, 477 U.S. at 322–23). If the movant meets their initial burden, the nonmovant must then "go beyond the pleadings" and demonstrate "that there is a 'genuine issue for trial.'" *Whitehead*, 979 F.3d at 1328 (quoting *Celotex*, 477 U.S. at 324); *Gogel*, 967 F.3d at 1134 (citation omitted). The nonmovant must "present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating specific facts showing a genuine issue for trial." *Lamar v. Wells Fargo Bank*, 597 F. App'x 555, 557 (11th Cir. 2014) (per curiam) (first citing *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); and then citing *Celotex*, 477 U.S. at 324).

Under Middle District of Georgia Local Rule 56, "[t]he movant for summary judgment" must submit "a separate and concise statement of material facts to which the movant contends there is no genuine dispute to be tried." M.D. Ga. L.R. 56. Local Rule requires the non-movant to respond "to each of the movant's numbered material facts" and warns that "[a]ll material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate." *Id.*; *see also* Fed. R. Civ. P. 56(c). Additionally, Local Rule 56 provides that "documents and other record materials relied upon by a party moving for or opposing a motion for summary judgment . . . be clearly identified for the court" by citations to "dates, specific page numbers, and line numbers" when possible. *Id.*

Plaintiff's Response to Defendant's Statement of Material Facts does not fully comply with the requirements of Local Rule 56. For example, Plaintiff disputes many of Defendant's numbered facts without specifically controverting the statement or citing any materials in the record supporting his position. (*See, e.g.*, Doc. 26-1 ¶¶ 12, 24–25, 37, 54–55). Several of Plaintiff's responses include broad, non-specific citations to entire documents in the record. (*See, e.g.*, *id.* ¶ 29 (citing to Plaintiff's entire initial, superseded Complaint); *id.* ¶¶ 36, 46 (citing Plaintiff's entire seven-page affidavit, containing forty-four paragraphs)). In many cases, these broad citations do not address Defendant's specific factual allegation or do not support Plaintiff's denial. (*See, e.g.*, *id.* ¶¶ 46). Accordingly, the Court deems as admitted all facts in Defendant's Statement of Material Facts that are

supported by specific record citation and which were not controverted by Plaintiff in accordance with Local Rule 56. *See* M.D. Ga. L.R. 56; *see also Mason v. George*, 24 F. Supp. 3d 1254, 1260 (M.D. Ga. 2014).

## FACTUAL BACKGROUND

Plaintiff, who suffers from a seizure disorder, was a social services technician employed by Defendant. (Doc. 21-2 ¶¶ 1, 9; Doc. 26-1 ¶¶ 1, 9). Defendant is a community service board that provides a variety of mental health, substance abuse, and disability treatment services in Southwest Georgia.[2] (Doc. 21-2 ¶ 2; Doc. 26-1 ¶ 2); O.C.G.A. § 37-2-6 et seq. Defendant operates outpatient clinics, residential treatment programs, crisis units, group counseling, and other programs at facilities throughout the counties it serves. (Doc. 21-2 ¶ 2; Doc. 26-1 ¶ 2; Doc. 26-4 at 21:17–23:20). Plaintiff began working for Defendant in May 2018 as a social services technician with Defendant's New Beginnings program in Americus, Georgia. (Doc. 21-2 ¶¶ 4, 9; Doc. 26-1 ¶¶ 4, 9). Before he was hired by Defendant, Plaintiff was a participant in Defendant's addiction recovery programs for many years. (Doc. 21-2 ¶¶ 3–4; Doc. 26-1 ¶¶ 3–4; Doc. 26-3 ¶¶ 3, 6; Doc. 26-5 at 41:7–42:7). One of Plaintiff's recovery goals was to become a counselor so he could "share [his] strength, hope, and experience with other individuals" facing similar mental health or addiction struggles. (Doc. 26-5 at 48:7–9, 54:6–10; Doc. 21-2 ¶ 6; Doc. 26-1 ¶ 6). Plaintiff expressed his desire to help others this way during his individual counseling sessions with Defendant's Clinical Director, Willie Greene. (Doc. 21-2 ¶¶ 5–6; Doc. 26-1 ¶¶ 5–6; Doc. 26-5 at 49:4–7; Doc. 26-4 at 39:21–40:2). When a social services technician position with the New Beginnings program became available, Greene recommended Plaintiff apply. (Doc. 21-2 ¶ 5; Doc. 26-1 ¶ 5; Doc. 26-4 at 39:13–40:9; Doc. 26-3 ¶ 8; Doc. 26-5 at 49:1–10). At the time Greene recommended Plaintiff apply, Greene

---

[2]    The relevant facts are derived from Defendant's Statement of Material Facts (Doc. 21-2), Plaintiff's Response to Defendant's Statement of Material Facts (Doc. 26-1), and the record in this case. Where relevant, the factual summary also contains undisputed and disputed facts derived from discovery and disclosure materials on file, and any affidavits. The Court construes the facts in the light most favorable to Plaintiff, the nonmoving party. *See* Fed. R. Civ. P. 56; *Jacoby v. Baldwin County*, 835 F.3d 1338, 1342–43 (11th Cir. 2016). The Court's citations to deposition testimony correspond to the actual deposition transcript page number. All other citations refer to the docket page number.

knew that Plaintiff did not have a valid driver's license—a requirement for the job— because he suffered from a seizure disorder. (Doc. 21-2 ¶ 7; Doc. 26-1 ¶ 7; Doc. 26-4 at 52:6–53:1, 53:17–54:9). Greene advised Plaintiff that he was willing to work with Defendant's CEO and Human Resources director to waive the license requirement, as long as Plaintiff agreed to be responsible for arranging his transportation to and from work. (Doc. 21-2 ¶ 8; Doc. 26-1 ¶ 8; Doc. 26-4 at 41:4–21, 45:10–13).

During his first year of employment with Defendant, Plaintiff pursued various training and certification opportunities, including certified peer specialist credentials offered by the Georgia Department of Behavioral Health and Developmental Disabilities. (Doc. 21-2 ¶ 10; Doc. 26-1 ¶ 10; *see* Doc. 9 ¶ 30). A certified peer specialist (CPS) is someone who has "lived experience" with a mental health condition or substance use disorder and is trained by the state to provide recovery support services to peers struggling with similar conditions. (*See* Doc. 26-5 at 53:16–54:10; Doc. 26-4 at 29:25–34:3). The Georgia Department of Behavioral Health and Developmental Disabilities offers specialty CPS certifications for mental health and addictive disease service providers. (Doc. 26-4 at 29:25–34:3). Shortly after he started working for Defendant, Plaintiff applied for the training programs required for each certification. (Doc. 21-2 ¶¶ 10–11; Doc. 26-1 ¶¶ 10–11; Doc. 26-5 at 50:3–11, 52:1–7). He obtained his CPS-Mental Health certification after completing a week and a half long training program in Columbus, Georgia, in September 2018. (Doc. 26-5 at 14:8–20; Doc. 27-8 at 2–3). Plaintiff's applied to the Certified Addiction Recovery Empowerment Specialist (CARES) training program for the addictive disease certification, but he was not accepted. (Doc. 21-2 ¶ 11; Doc. 26-1 ¶ 11; Doc. 26-4 at 199–201:18, 202:3–204:9; Doc. 27-6 ¶ 4).

In October 2019, Plaintiff was informed that he would be transferred to Defendant's New Life program to fill a vacant peer recovery coach position. (Doc. 21-2 ¶ 13; Doc. 26-3 ¶¶ 18–19). The Parties dispute the circumstances of the transfer. According to Plaintiff, the transfer was a disciplinary action, and Plaintiff complained that the transfer was "punitive" and "unjust." (*See e.g.*, Doc. 26-10 at 2–3; Doc. 26-3 ¶¶ 18–19, 21). Notably, on

October 31, 2019, Defendant, through the Clinical Director, and Plaintiff signed a form
stating, in pertinent part:

> As reported an Employee at New Beginnings called 911 law
> enforcement to the site Thursday, October 17, 2019 without
> consulting his supervisor . . . As a result see the following
> actions:
>
> - A Two Day Suspension
> - A transfer to New Life ARC from New Beginnings will
>   occur effective November 26, 2019.

(Doc. 26-8 at 2). According to Greene, however, the transfer was made because he believed
Plaintiff would be perfect for the position in the New Life program as the primary mission
of the program was to assist recovering addicts to transition back to the community.
(Doc. 21-2 ¶¶ 13–15). Greene said that he believed the transfer would advance Plaintiff's
career goals for multiple reasons, including the fact that Jennifer Castro, the manager at
New Life, could leverage her involvement with the CARES training program so Plaintiff
could reapply for the CPS-Addictive Disease certificate. (Doc. 21-2 ¶¶ 13, 21–26; Doc. 26-
4 at 89:4–93:2, 173:21–176:24). Angela Holt, Defendant's Corporate Compliance Officer
and Chief Operations Officer at the time, testified that she "was involved in assessing
[Plaintiff's] services with the agency and the agency's needs in making the determination
and recommendation to transfer" Plaintiff to New Life and confirmed that "[p]lans were
being made to transfer" Plaintiff "prior to October 17, 2019." (Doc. 27-6 ¶¶ 2–3, 5). She
further testified that the final transfer decision was based on "[t]he agency['s] need to fill
the position," as "[t]he New Life program had a small staff of only three people and a
vacancy seriously impeded the program's operations," and "also based on several factors
that [she] believed would have benefitted [Plaintiff]" and his professional goals. (*Id.* ¶¶ 5,
7). In response to Plaintiff's complaint, Mr. Greene advised Plaintiff that "because [the]
transfer [was] based on programmatic need and not adverse action," Plaintiff would still
be transferred to New Life effective November 25, 2019. (Doc. 26-3 ¶ 23; Doc. 26-11 at 2).

  Plaintiff continued to object to the transfer and raised concerns about transportation
to the New Life location in a November 19, 2019 meeting with Ryan Hoffman, the Human

Resources Director, Beth Reagan, the CEO, and Angela Holt, the Corporate Compliance Officer, and in an email sent to Greene, Jones, and Reagan on November 22, 2019. (Doc. 26-3 ¶¶ 21–22; Doc. 26-12 at 2–3). Plaintiff reiterated his concerns in an internal grievance filed with Defendant, stating:

> I have expressed my concerns regarding getting to the new transfer site due to my disability. I have been told that I will 'have to be responsible for getting to work,' even after my request for 'reasonable accommodations' in accordance with the Americans with Disabilities Act (ADA). I request that I be relieved of the 'undue hardship' as defined in Title I of the ADA of 1990 by having a workplace that allows me to get to work despite my disability, such as the site I work at now.

(Doc. 26-13 at 5). The New Life facility was located about 3 miles away from the New Beginnings facility. (Doc. 21-2 ¶ 16; Doc. 26-1 ¶ 16). While employed by Defendant, Plaintiff lived approximately 2.3 miles from the New Beginnings facility and 5.3 miles from the New Life facility. (Doc. 21-2 ¶¶ 17–18; Doc. 26-1 ¶ 17–18; Doc. 27-1 at 2; Doc. 27-2 at 2). Under protest, Plaintiff went to work at New Life and initially was able to ride with another employee, Summer Murray. (Doc. 26-3 ¶ 31). Eventually, that arrangement was terminated as Defendant told Murray that liability issues could arise for Defendant if Plaintiff had a seizure while riding in her car. (*Id.*).

Plaintiff's first assigned day at New Life was November 26, 2019. Plaintiff left work early that day and later provided a doctor's note that excused him from work until December 4, 2020. (Doc. 21-2 ¶ 40). After obtaining doctor's notes excusing him from work for two more weeks, Plaintiff returned to work on December 17, 2020. (Doc. 21-2 ¶¶ 41–43). The note that authorized Plaintiff's return to work included a driving restriction. (Doc. 26-14 at 7). Plaintiff suffered a seizure on January 14, 2020 while he was at work and had to be taken to the hospital in an ambulance. (Doc. 26-3 ¶ 31). After Plaintiff returned to work, Castro requested Plaintiff accompany her on a business-related trip to Walmart. (Doc. 21-2 ¶ 46; 26-1 ¶ 46). Plaintiff refused her request and "asked to simply remain at the New Life location." (Doc. 21-2 ¶ 46; Doc. 26-14 ¶ 46; Doc. 26-3 ¶ 31). Plaintiff explained that he declined to ride with Castro believing that she was subject to the

same restriction as Murray. (Doc. ¶ 31). On January 27, 2020, Plaintiff submitted a note from Dr. Patel which stated that Plaintiff "had recurrent seizure and anxiety episodes and so he was advised not to drive or travel at this time. He can perform his daily routine activity." (Doc. 26-14 at 2).

After Plaintiff provided the note to Defendant, he was advised on January 30, 2020, not to return to work until he was medically cleared to travel. Defendant explained that Plaintiff was placed on leave without pay because "[t]he 'no travel' restriction" "prevent[ed] [him] from performing an essential function of the Peer Recovery Coach at New Life." (Doc. 21-3 at 46). Plaintiff was advised that additional information was needed to assess whether Defendant could provide a reasonable accommodation for his medical condition and given a medical authorization clearance to complete and inquiry form that Dr. Patel needed to complete. (Doc. 21-2 ¶¶ 56–57; Doc. 26-1 ¶¶ 56–57). The medical inquiry form posed four questions to Dr. Patel:

1. Please explain what you mean when you state that Mr. Reid should not "travel".

2. Please explain the medical basis of the "no travel" restriction.

3. Please state the date by which you estimate that you will lift the no travel restriction you have imposed on Mr. Reid and the basis for your opinion that you will be able to lift the restriction at that time.

4. Can Mr. Reid perform all the functions listed on the attached job description? If not, please list those he cannot perform and the estimated period of time he will be unable to perform them.

(Doc. 21-3 at 51). Defendant stated that Dr. Patel's response was needed by February 19, 2020. (*Id.* at 46). Neither Plaintiff, nor his health care providers, returned the form or provided any further information about Plaintiff's medical condition. (Doc. 21-2 ¶ 57; Doc. 26-1 ¶ 57; Doc. 26:5 at 192:6–194:6).

On April 15, 2020, Plaintiff filed a charge of disability discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC). (Doc. 21-7). On September 22, 2020, the EEOC dismissed Plaintiff's charge and issued a right to sue letter. (Doc. 9-1).

**DISCUSSION**

Plaintiff asserts that Defendant discriminated against him when it (1) denied him reasonable accommodations, (2) placed him on unpaid leave,[3] and (3) transferred him from New Beginnings to New Life. (Doc. 9 ¶¶ 91, 101–04, 112–13; Doc. 21-7 at 2). Plaintiff also alleges that Defendant retaliated against him for complaining about the alleged discrimination. (Doc. 9 ¶¶ 114–15). He brings claims under the American with Disabilities Act (ADA), Section 504 of the Rehabilitation Act of 1973, and Title VII of the Civil Rights Act of 1964. (*Id.* ¶¶ 86–116). Defendant argues that it is entitled to summary judgment on all Plaintiff's claims. (Doc. 21-1 at 11–20).

## I.   Disability Discrimination

Under Title I of the ADA, a covered employer is prohibited from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). For an ADA discrimination claim to survive summary judgment, "a plaintiff must produce sufficient evidence to permit a jury to find that [he]: (1) is disabled, (2) is a qualified individual, and (3) was discriminated against because of [his] disability." *Lewis v. City of Union City (II)*, 934 F.3d 1169, 1179 (11th Cir. 2019) (citing *Mazzeo v. Color Resols. Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014)).[4]

---

[3]     Throughout their briefing, both Parties refer to Defendant's action of placing Plaintiff on leave without pay as Plaintiff's "termination" or "discharge." (*See, e.g.*, Doc. 21-1 at 13; Doc. 26 at 7; Doc. 27 at 4). There is no evidence in the record about the date that Plaintiff's employment with Defendant was officially terminated. In the EEOC Charge filed on April 15, 2020, however, Plaintiff states that "[t]o date, I am currently on [Leave Without Pay] LWOP." (Doc. 21-7 at 2). Thus, the Court references the Parties' arguments about Plaintiff's termination as arguments about Plaintiff's involuntary unpaid leave, but the Court's analysis of these arguments and the underlying claims are not impacted by this fact.

[4]     Claims brought under Title I of the ADA and the Rehabilitation Act are analyzed under "the same legal framework." *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1214 (11th Cir. 2021) (citation omitted); *EEOC v. STME, LLC*, 938 F.3d 1305, 1314 n.3 (11th Cir. 2019) ("The Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* applies the same standards and follows the same analysis as claims under the ADA." (citation omitted)). "[C]ases involving the ADA are precedent for those involving the Rehabilitation Act," and vice versa. *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (first citing *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000); and then citing 29 U.S.C. § 794(d)).

With regard to the second element, a "qualified individual" is a person who "is able to perform the essential functions of the job in question with or without a reasonable accommodation." *Boyle v. City of Pell City*, 866 F.3d 1280, 1288 (11th Cir. 2017); 42 U.S.C. § 1211(8). To establish the third element, a plaintiff may demonstrate that his "employer fail[ed] to provide 'reasonable accommodations' for the disability" or that "he suffered an 'adverse employment action' because of his disability." *Barneman v. Int'l Longshoreman Assoc. Loc. 1423*, 840 F. App'x 468, 478–79 (11th Cir. 2021) (per curiam) (first quoting *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); and then quoting *EEOC*, 938 F.3d at 1314); *see* 42 U.S.C. § 12112(b)(5)(A). The Parties do not dispute that Plaintiff has a disability—a seizure disorder. The Parties dispute, however, whether Plaintiff was a qualified individual and whether he was discriminated against because of his disability.

### A. Qualified Individual

#### 1. Essential Function

"Essential functions" are "the fundamental job duties of the employment position." 29 C.F.R. § 1630.2(n)(1). "Whether a particular job function is essential is 'evaluated on a case-by-case basis by examining a number of factors." *Samson v. Fed. Exp. Corp.*, 746 F.3d 1196, 1200–01 (11th Cir. 2014). When "determining whether a function is 'essential,' the district court must consider the employer's judgment about the essential functions of a position and any written descriptions the employer prepared before advertising or interviewing applicants for the position." *Garrison v. City of Tallahassee*, 664 F. App'x 823, 826 (11th Cir. 2016) (per curiam) (citing 42 U.S.C. § 1211(8)). "Other relevant factors include "the amount of time spent on the job performing the function[,] the consequences of not requiring the employee to perform the function[,] . . . the work experience of past employees in the job[,] and the current work experience of employees in similar jobs." *Samson*, 746 F.3d at 1201 (citing 29 C.F.R. § 1630.2(n)(3)(ii)–(vii)). A job function may be essential "because the reason the person exists is to perform that function" or "because of the limited number of employees available among whom the performance of that job function can be distributed." 29 C.F.R. § 1630.2(n)(1).

While the record does not contain a clear job description of the social services technician position, Green testified that New Beginnings, the program at which Plaintiff was a social services technician, is "an intensive outpatient program where they work with individuals with a primary diagnosis of substance abuse." (Doc. 26-4 at 64:20–21). Greene agreed that Plaintiff "had the requisite qualifications," "the required knowledge," and "the required skill set" for a social services technician. (*Id.* at 111:8–115:8). Accordingly, Plaintiff was a qualified individual with regard to the social services technician position.

With regard to the peer recovery coach position, neither the written job description nor Defendant's judgment support Defendant's contention that travel was an essential job function. Defendant points to the statement on the job description that a "Recovery coach *can* organize, host, and/or connect people to the following activities at the workplace or in the community to support overall health and wellness." (Doc. 21-8 at 2–3 (emphasis added)). Nothing in this statement says that the coach will have to travel to perform these activities. Organizing and hosting do not inherently involve travel, and connecting is an implicitly passive activity. Furthermore, the same job description lists possession of a "valid, unrestricted Georgia driver's license" as minimum requirement of the job. (*Id.* at 2) Notably, Defendant waived the requirement that Plaintiff have a valid Georgia driver's license when they assigned him to the new position. (*See* Doc. 26-4 at 168:14–24). They had also waived the same requirement while Plaintiff was at New Beginnings. (Doc. 21-2 ¶ 8; Doc. 26-1 ¶ 8). Defendant also expressed a concern that it could be held liable if Plaintiff had a seizure while riding in a co-worker's car. (Doc. 26-3 ¶ 31). The fact that Defendant excused Plaintiff from driving and had concerns about liability issues if Plaintiff were to ride with a co-worker weighs against the argument that Defendant considered travel essential when it put Plaintiff in the peer recovery coach position. Arguably, if Defendant believed travel to be an essential function of the job, it would not have forced a person who they knew had no driver's license due to a seizure disorder into a position for which he was not qualified.

Nor does the amount of time spent travelling or the consequences of not requiring the travel, weigh in favor of finding that travel is an essential element of the position. Travel

was a small part of Plaintiff's duties during the time he worked at New Life. Greene could not say whether "outings were greater or less than 10 percent of [Plaintiff's] job duties." (Doc. 26 at 12; Doc. 26-4 at 179:2–179:10). Greene testified that he could not estimate what portion of Plaintiff's job duties included travel, stating, "every now and then they would take the guys bowling. They may take them fishing. They may want to take them to Walmart to do some shopping . . . ." (Doc. 26-4 at 179:10–13). Moreover, seizures caused Plaintiff to be out of work for a significant portion of the time he was at New Life; and Defendant's presented no evidence that his absence upset their ability deliver on their mission. Additionally, Holt explained that the Georgia Department of Behavioral Health and Developmental Disability required Defendant "to maintain a ratio of staff to consumers on agency transports and agency sponsored field trips" and that "[t]he New Life program did not have enough staff to provide coverage for an employee who could not travel." (Doc. 27-6 ¶¶ 10–11). She also testified that "[a] failure to provide social outing services, as well as a failure to provide staff ratios on outings, would jeopardize the agency's accreditation/certification which were necessary to receive state and federal funding." (*Id.* ¶ 11). But, again, that Defendant—knowing that Plaintiff could not drive or ride with other employees because of his seizure disorder—would force Plaintiff into a position that required travel at the very least raises a genuine question as to whether travel was an essential job function. Viewing the evidence in the light most favorable to Plaintiff, the non-moving party, there is a genuine issue of material fact as to whether travel was an essential element of the job.

### 2.  Reasonable Accommodation

Next, the Court considers whether Plaintiff could have performed these functions with reasonable accommodations. *See Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290–91 (11th Cir. 2002). "The burden of identifying an accommodation that would allow a qualified employee to perform the essential functions of [his] job rests with that employee, as does the ultimate burden of persuasion with respect to showing that such accommodation is reasonable." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000) (citing *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997)).

A "reasonable accommodation" is one that entails "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). "Job restructuring [and] part-time or modified work schedules" are two examples of reasonable accommodations. *Id.* § 1630.2(o)(2)(ii). "Whether an accommodation is reasonable depends on specific circumstances." *Terrell v. USAir*, 132 F.3d 621, 626 (11th Cir. 1998).

An employer is not required to provide any accommodation that an employee desires or to eliminate essential functions of the job. *Stewart*, 117 F.3d at 1285–86; *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1256 (11th Cir. 2007). Nor is an employer "required, under the guise of a reasonable accommodation, to hire another employee to perform essential functions of the ADA plaintiff's job." *Johnson v. Ga. Dep't of Hum. Res.*, 983 F. Supp. 1464, 1474 n.11 (N.D. Ga. 1996); *see also Everett v. Grady Mem'l Hosp. Corp.*, 703 F. App'x 938, 946 (11th Cir. 2017) ("[T]he ADA does not require the employer to eliminate an essential function of the plaintiff's job or place it upon someone else.").

Plaintiff argues that he requested three accommodations: (1) to be exempted from travel until released from his medical restrictions; and (2) to be allowed to host prosocial and recreational activities for clients on the New Life campus; and (3) to delay applying for CARES certification. (Doc. 26 at 7–9). Given the arguably temporary nature of the restriction, Plaintiff's requests would not have required Defendant to "eliminate an essential function of [Plaintiff's] job or place it upon someone else," which the ADA does not require. *See Everett*, 703 F. App'x at 946. Rather, Plaintiff's first requested accommodation—not travelling until his medical restrictions were lifted—was, as far as anyone knew, temporary. His request to host events on campus would not have eliminated the outings; rather they would have let him carry out the function in a modified manner. Finally, to the extent that CARES certification was a job requirement, it begs the question of why Plaintiff was forced into a position for which he was not qualified. Accordingly,

viewing the facts in the light most favorable to Plaintiff, Plaintiff was a qualified individual with regard to the peer recovery coach.

### B. Discriminated Against Because of Disability

To satisfy the third element, a plaintiff may show that he was discriminated against because of his disability by demonstrating that his "employer fail[ed] to provide 'reasonable accommodations' for the disability" or that "he suffered an 'adverse employment action' because of his disability." *Barneman*, 840 F. App'x at 478–79 (first quoting *Lucas*, 257 F.3d at 1255; and then quoting *EEOC*, 938 F.3d at 1314); *see* 42 U.S.C. § 12112(b)(5)(A).

#### 1. Failure to Accommodate

One way a plaintiff may satisfy the third element is by establishing a genuine issue of material fact as to whether the defendant failed to provide a reasonable accommodation for his disability. *Boyle v. City of Pell City*, 866 F.3d 1280, 1289 (11th Cir. 2017) ("An employer unlawfully discriminates against an otherwise qualified person with a disability when it fails to provide a reasonable accommodation for the disability, unless doing so would impose an undue hardship on the employer."); *Holly*, 492 F.3d at 1262. "The ADA requires an employer to accommodate an employee with a known disability unless the accommodation would result in undue hardship to the employer." *Batson v. Salvation Army*, 897 F.3d 1320, 1326 (11th Cir. 2018) (citing *Earl*, 207 F.3d at 1365); 42 U.S.C. § 12112(b)(5)(A)). An "[employer's] duty to provide a reasonable accommodation," however, "is not triggered unless a specific demand for an accommodation has been made" by the employee. *D'Onofrio v. Costco Wholesale Corp.*, 964 F.3d 1014, 1022 (11th Cir. 2020) (quoting *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363-64 (11th Cir. 1999)).

As noted above, Plaintiff argues that he requested three accommodations: (1) to be exempted from travel until released from his medical restrictions; and (2) to be allowed to host prosocial and recreational activities for clients on the New Life campus; and (3) to delay applying for CARES certification. (Doc. 26 at 7–9). Viewing the facts in the light most favorable to Plaintiff, Plaintiff made "specific demands" for certain reasonable

accommodations in response to his increased seizures and his doctor's advice that he not travel while he was having seizures on a regular basis.

First, Plaintiff requested to be exempted from travel until his medical restrictions were lifted. After a meeting with Healthcare Staffing, Plaintiff was advised that he could continue to work but would not be required to travel. (Doc. 26-3 ¶ 41). This accommodation was rescinded the following week because Defendant determined that Plaintiff could not return to work with medical restrictions. (*Id.* ¶ 42). Greene referred to this policy, but no such written policy is in the record. (*See* Doc. 26-4 at 180:15–181:10, 184:1–19). Upon questioning, Greene explained that an employee has to be cleared 100% with no medical restrictions before being allowed to return to work but that the policy—such as it is—may not be applied uniformly to all employees. (*Id.* at 180:16–19, 198:14–199:13). Because Dr. Patel restricted Plaintiff from driving and travel, Defendant—pursuant to their policy—placed him on leave without pay until he could return with no restrictions. Notably, Dr. Patel had also restricted Plaintiff from driving on December 11, 2019; but Defendant did not apply the policy, and instead allowed Plaintiff to return to work with the medical restriction in place. (*See* Doc. 26-14 at 7). Thus, Plaintiff has met his burden of showing that he made a "specific demand" for an accommodation to be exempted from all travel until his medical restrictions were lifted.

With respect to Plaintiff's request to delay applying for CARES certification, Plaintiff avers that, "[i]n early January 2020, Ms. Castro began demanding that I make application to the CARES Academy immediately." (Doc. 26-3 ¶ 37). After Plaintiff suffered multiple seizures on January 14, 2020, he emailed Castro, Greene, and a Healthcare Staffing employee on January 21, 2020:

> As you are aware I was taken to the emergency room on 01/14/2020 by ambulance from work due to 3 documented seizures by the EMTs and 1 seizure while at the hospital. I was given a follow-up appointment to my neurologist on 01/17/2020. I had to return to the emergency room over the weekend due to seizures.
>
> After going over several test on the 17th (including blood work) he has deemed the frequency of my seizures due to work

related stress. He, as well as myself, have grave health concerns because of the frequency during the past several months of seizures. Consequently, he has advised me to try and reduce my stress level and will be providing me a medical referral. In an effort to reduce some stress, I will not be, at this time going through the CARES application process or possible training. I have talked to my doctor about the process and training and he agrees that, at this time, it would not be beneficial for my health.

Should you desire documentation from him concerning this matter, please let me know and I will get that during my next neurologist appointment on 01/27/2020 at 9:30 am.

(Doc. 21-3 at 42). Plaintiff's email put Defendant on notice of his need for an accommodation regarding the CARES application process due to his medical condition. Thus, Plaintiff has also met his burden of showing that he made a "specific demand" for an accommodation to delay applying for CARES certification.

Plaintiff also argues that he asked to be allowed to host prosocial and recreational activities for clients on the New Life campus as a reasonable accommodation, but he has not presented evidence supporting this argument. (Doc. 26 at 8–9). In his affidavit, Plaintiff states that "he was never asked to attend an outing with consumers," but that he "was willing to perform the job duties which required [him] to have social and recreational events with consumers." (Doc. 26-3 ¶¶ 31–32). He explains that "[i]f [he] had been asked to conduct a social or recreational outing with consumers, which [he] had not been asked to do so before [he] was terminated, [he] would have followed my job description and conducted the activity at the workplace." (*Id.* ¶ 32). While this may have been a reasonable accommodation request given Plaintiff's medical restriction, Plaintiff does not identify when he requested Defendant allow him to conduct such activities at New Life instead of traveling. Nor does he assert that Defendant denied such a request. "[W]ithout evidence of a specific instance in which []he needed an accommodation and was denied one, [Plaintiff] cannot establish a failure to accommodate" claim based on this accommodation. *See Batson*, 897 F.3d at 1326.

Once a plaintiff has requested a reasonable accommodation, the employer "must provide such a reasonable accommodation for an employee with a known disability, unless it would result in undue hardship." *Bagwell v. Morgan Cnty. Comm'n*, 676 F. App'x 863, 866 (11th Cir. 2017) (per curiam) (citing *Lucas*, 257 F.3d at 1255); *Willis v. Conopco, Inc.*, 108 F.3d 282, 286 (11th Cir. 1997); 42 U.S.C. § 12112(b)(5)(A). "The ADA defines 'undue hardship' as 'an action requiring significant difficulty or expense.'" *Davis v. Columbus Consol. Gov't*, 826 F. App'x 890, 893 (11th Cir. 2020) (per curiam) (quoting 42 U.S.C. § 12111(1)(A)). "[T]he employer has the burden of persuasion regarding whether the accommodation would impose an undue hardship." *Id.* (citing *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1526 (11th Cir. 1997)). "To meet its burden of proof, the employer 'must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances.'" *Id.* (quoting *US Airways, Inc. v. Barnett*, 535 U.S. 391, 402 (2002). If the employer meets this burden of proof, "[u]ndue hardship 'is a complete defense to ADA liability.'" *Id.* (quoting *EEOC v. St. Joseph's Hosp. Inc.*, 842 F.3d 1333, 1349 (11th Cir. 2016)).

Defendant argues that both of Plaintiff's requested accommodations "would create an undue hardship on the operations of the agency." (Doc. 21-1 at 16–17; Doc. 27 at 7). With respect to Plaintiff's request to be exempted from all travel until his medical restrictions were lifted, Defendant argues that granting this accommodation would result in "an inability to provide services to consumers and a potential loss of funding for the New Life program (unless Defendant hires another employee to perform the duties)." (Doc. 27 at 7 (citing Doc. 27-6 ¶¶ 9–11)). Holt testified that, "[d]ue to budgetary concerns," the New Life program "must operate at minimally required staffing levels," so "[i]f [Plaintiff] could not travel, even for a short time period, another staff person had to be hired for the position to meet federal and state services mandates." (Doc. 27-6 ¶ 11). But, as discussed above, Plaintiff's seizures caused him to be out of work for a significant amount of time while at New Life, and Defendant does not point to any "case-specific" circumstances that his absence caused the agency any hardship. Defendant does not, for example, identify any scheduled outings in the days or weeks following Plaintiff's accommodation request where

it had to find other employees to attend to satisfy the mandated ratios, show that any other employees were asked to work overtime, or that an activity had to be cancelled due to a lack of available staff. Moreover, Greene testified that before Plaintiff was transferred to New Life, the peer recovery coach position had been vacant for several months. (Doc. 26-4 at 90:14–16). Accordingly, Defendant has not shown that exempting Plaintiff from travel until his restrictions were lifted would cause any "significant difficulty or expense" that the vacancy presumably caused. *See* 42 U.S.C.§ 12111(10)(A)–(B).

Nor has Defendant shown that delaying Plaintiff's CARES application would impose an undue hardship. Defendant claims that it was "imperative that this training be conducted as quickly as possible," but did not even confirm that Plaintiff would be able to fulfill this expectation before implementing his transfer to New Life. (*See* Doc. 26-4 ¶ 7). If any delay in CARES certification would significantly impact Defendant's finances, operations, or resources, one would expect Defendant to hire someone who already had the required certification. Defendant's argument that allowing Plaintiff to delay applying for the CARES training would cause "significant difficulty or expense" is not supported by the requisite evidence for an undue hardship affirmative defense. *See Davis*, 826 F. App'x at 893. Accordingly, Defendant has not met its burden of showing that either of the reasonable accommodations Plaintiff requested would impose an undue hardship.

Defendant, in passing, notes that Plaintiff failed to have Dr. Patel complete medical documentation about the medical basis for the restriction and when it would be lifted. (Doc. 27 at 8). To the extent that Defendant attempts to argue that this shows Plaintiff failed to engage in the interactive process required under the ADA, this argument does not entitle Defendant to summary judgment. Defendant did not engage in a good-faith interactive process when it received documentation of Plaintiff's medical restriction, but instead, immediately put him on unpaid leave. Defendant cannot show, as a matter of law, that Plaintiff is responsible for any communication breakdown. Accordingly, Defendant is not entitled to summary judgment on Plaintiff's failure to accommodate claims as to the accommodations of a travel exemption until Plaintiff's medical restrictions were lifted or a delay in Plaintiff's CARES application.

## 2.  Adverse Action Because of Disability

A plaintiff can also establish the third element of a disability discrimination claim by showing that he was discriminated against because of his disability by demonstrating that "he suffered an 'adverse employment action' because of his disability." *Barneman*, 840 F. App'x at 478–79 (first quoting *Lucas*, 257 F.3d at 1255; and then quoting *EEOC*, 938 F.3d at 1314); *see* 42 U.S.C. § 12112(b)(5)(A). An adverse employment action is a "material change in the terms, conditions, or privileges of employment." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). Plaintiff identifies two adverse actions: (1) Defendant involuntarily placing him on leave without pay, and (2) Defendant transferring him from New Beginnings to New Life. (Doc. 26 at 6–7).

Being placed on indefinite unpaid leave is an adverse employment action as "it directly affects the employee's compensation." *See Miller v. Brennan*, 1:15-CV-00079-CC, 2016 WL 1237851, at *2 (N.D. Ga. Mar. 30, 2016) (collecting cases). There is a genuine issue of material fact as to whether the transfer would constitute a separate adverse action. "An involuntary transfer may be an actionable adverse employment action 'if it involves a reduction in pay, prestige, or responsibility.'" *Brown v. Jefferson Cnty. Sheriff's Dep't*, 806 F. App'x 698, 702 (11th Cir. 2020) (per curiam) (quoting *Hinson v. Clinch Cnty. Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000)); *Roberts v. Archbold Med. Ctr.*, 220 F. Supp. 3d 1333, 1351–52 (M.D. Ga. 2016). "Not all employer actions that negatively impact an employee qualify as 'adverse employment actions.'" *Peddie v. InComm*, 834 F. App'x 552, 554 (11th Cir. 2020) (per curiam) (quoting *Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010)). "Rather, only those employment actions that result in 'a *serious and material* change in the terms, conditions, or privileges of employment' will suffice." *Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010). While transfer did not involve a "reduction in pay, prestige, or responsibility," it did cause a serious and material change to the terms of Plaintiff's employment by significantly increasing the amount of travel required. Thus, the Court next considers whether Plaintiff has shown that these adverse actions were taken "because of" his disability.

A plaintiff can show that an adverse employment action was taken "because of" his disability under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or the convincing mosaic standard. *Todd*, 998 F.3d at 1215. *Walls v. Lowe's Home Centers, LLC*, 789 F. App'x 852, 854 (11th Cir. 2019) (per curiam) (citing *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255 (11th Cir. 2012)). Under the *McDonnell Douglas* burden-shifting framework, in addition to establishing he is disabled and otherwise qualified, the plaintiff must show that "similarly situated employees outside of [his] protected class were treated differently." *Lewis II*, 934 F.3d at 1179; *Ward v. United Parcel Serv.*, 580 F. App'x 735, 740 (11th Cir. 2014) (per curiam). If the plaintiff successfully identifies a similarly situated comparator who was not subject to the same adverse action, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason" for the adverse employment action. *Lewis v. City of Union City (Lewis I)*, 918 F.3d 1213, 1221 (11th Cir. 2019) (en banc). "Finally, should the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination." *Id.*

Here, Plaintiff does not point to a similarly situated comparator outside his protected group who was not subject to the similar adverse actions. Thus, he must present a "convincing mosaic" of "non-comparison circumstantial evidence" sufficient to raise a reasonable inference of intentional discrimination" regarding his transfer and unpaid leave. *See Walls*, 789 F. App'x at 855 (citing *Chapter 7 Tr.*, 683 F. 3d at 1256). A "convincing mosaic" may be established with "evidence that demonstrates, among other things, "(1) 'suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis II*, 934 F.3d at 1185 (citation omitted).

As for being placed on unpaid leave, Plaintiff has established sufficient circumstantial evidence to raise an inference of discriminatory intent. Although Defendant attempts to characterize its decision to put Plaintiff on unpaid leave as required by policy, it cannot—and does not—dispute that this action was taken because of Plaintiff's medical

condition. Plaintiff has demonstrated that Defendant failed to provide any of his requested reasonable accommodations or to engage in a good-faith interactive process before rapidly placing him on unpaid leave. The events leading up to this adverse action, temporal proximity to Dr. Patel's note, and lack of any non-disability related reason for placing Plaintiff on leave is certainly sufficient evidence to establish a convincing mosaic precluding summary judgment.

With respect to the transfer to New Life, Plaintiff argues that Defendant first advised him that he was being transferred as a result of a disciplinary action, but then said that the transfer was due to "programmatic need," creating "a dispute as to a material fact which should preclude summary judgment." (Doc. 26 at 5). Defendant argues that Plaintiff's transfer was for programmatic need and was not pretext for discrimination. (Doc. 27 at 4). Here, while the circumstances surrounding the transfer are questionable, Plaintiff has failed to present evidence that intentional discrimination was the motivation for the transfer. While Defendant made ambiguous, if not directly contradictory, statements regarding the reason for the transfer and, while Plaintiff, arguably, was not qualified for the position given that he could not drive and Defendant had concerns about him riding with other employees and that Defendant needed the peer recovery coach to be CARES certified, Plaintiff has failed to offer a convincing mosaic of non-comparison circumstantial evidence to raise an inference of intentional discrimination. Accordingly, Plaintiff's intentional discrimination claim based on his transfer to New Life cannot survive summary judgment.

## II.   Retaliation

Defendant argues that it is also entitled to summary judgment on Plaintiff's retaliation claim because even if Plaintiff could establish a prima facie case of retaliation, Plaintiff cannot show that Defendant's legitimate, nondiscriminatory reason for placing Plaintiff on unpaid leave was pretextual. (Doc. 21-1 at 18–19). Plaintiff argues that there "was no reason for Defendant to believe, based on the medical excuse from Dr. Patel, that Plaintiff's travel restriction was permanent." (Doc. 26 at 7). He contends that the fact that Defendant placed him on unpaid leave before engaging in an interactive dialogue about his travel restriction shows that Defendant wanted to terminate Plaintiff because of his

disability and would have terminated Plaintiff "regardless of what the medical issue may have been." (*Id.* at 9–14).

As a threshold matter, Plaintiff does not assert a claim for retaliation under either the ADA or the Rehabilitation Act. (*See* Doc. 9 ¶¶ 108–16). Rather, Plaintiff's Amended Complaint brings a retaliation claim only under Title VII. He alleges that he "was discriminated against based on his disability" and was retaliated against because he "engaged in protected opposition to disability discrimination" in violation of Title VII of the Civil Rights Act. (*Id.*). Title VII, however, applies to discrimination and retaliation claims involving actions taken because of an individual's "race, color, religion, sex, or national origin." 42 U.S.C. §§ 2000e-2(a), 2000e-3(a); *see Garrett v. Postmaster United States Postal Servs.*, 725 F. App'x 782, 784 n.1 (11th Cir. 2018) (per curiam). Plaintiff's claims do not relate to his race, color, religion, sex, or national origin. Thus, Title VII does not apply to Plaintiff's discrimination or retaliation claims. *See Birdyshaw v. Dillard's Inc.*, 308 F. App'x 431, 436–37 (11th Cir. 2009) (holding a plaintiff asserting a Title VII retaliation claim "was not opposing any employment practice made unlawful under Title VII because she referred only to age, which is not a protected ground under the statute"). Accordingly, Plaintiff's retaliation claim fails as a matter of law.

## CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment (Doc. 21) is **DENIED in part and GRANTED in part**. Plaintiff's failure to accommodate claims based on a temporary travel exemption and CARES application delay and Plaintiff's intentional discrimination claim based on his unpaid leave may proceed to trial.

**SO ORDERED**, this 30th day of September, 2022.

/s/ Leslie A. Gardner
**LESLIE A. GARDNER, JUDGE**
**UNITED STATES DISTRICT COURT**